**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **ERIC J. CAZAUBON, PERSONALLY AND ON BEHALF OF ST. TAMMANY WHOLESALE GOLD** | **CIVIL ACTION** |
| **VERSUS** | **NO.** |
| **MR PRECIOUS METALS, LLC, YANCIE MOSELY, III AND WALTER REED** | **SECTION** |

**VERIFIED RICO COMPLAINT**

NOW INTO COURT, through undersigned counsel, come plaintiffs, who respectfully file this Verified RICO Complaint, presenting allegations and causes of action as follows:

**PLAINTIFFS**

This complaint is filed on behalf of plaintiff:

1.   Eric J. Cazaubon, a person who has reached the age of majority and is domiciled in Jefferson Parish, Louisiana, who was doing business as St. Tammany Wholesale Gold.

**DEFENDANTS**

Made Defendants herein are:

2.   MR Precious Metals, LLC, a Louisiana limited liability company with its registered office in St. Tammany Parish.

1

3.     Yancie H. Moseley, III, a person who has reached the age of majority and who resides in St. Tammany Parish.

4.     Walter Reed, a person who has reached the age of majority and who resides in St. Tammany Parish, who is only sued herein in his personal capacity.

## VENUE AND JURISDICTION

5.     Pursuant to 28 U.S.C. §1331, subject matter jurisdiction is present in this matter as it involves a federal question, specifically the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. 1961 et seq.

6.     Venue is appropriate in this Court pursuant to 28 U.S.C. §1391(b) because Defendants reside in this judicial district.

7.     Venue is also appropriate because a substantial part of the events giving rise to Plaintiffs' claims occurred in this judicial district.

## BACKGROUND

8.     Plaintiff, Eric Cazaubon, is a 51-year old businessman that has lived and worked in the New Orleans-area his entire life.

9.     In addition to various construction-related work, Cazaubon has sold used cars for many years.

10.    Beginning in 2004, Cazaubon opened and operated St. Tammany Wholesale, a used car dealership in Slidell, Louisiana.

11. On January 15, 2009, Cazaubon was arrested for possession of a Schedule IV substance (clonazepam) and for distribution of a controlled substance (hydrocodone).

12. Cazaubon was, in fact, arrested because he picked up a car payment owed to him by customers that were involved in illegal drug activity.

13. On occasion, Cazaubon's business financed car sales.

14. In January 2009, Rene Cortes and Melissa Stafford owed Cazaubon money for work that was performed on their vehicle, so Cazaubon made a phone call to inquire about the status the payment.

15. Cazaubon was advised that he could pick up a payment that evening from their home.

16. Accordingly, Cazaubon drove to their home near Pearl River, Louisiana to collect the payment.

17. Unbeknownst to him, the house was under police surveillance that evening because the occupants were suspected of selling hydrocodone.

18. As a result of visiting and collecting cash from the occupants, Cazaubon was stopped by the St. Tammany Parish Sheriff's Office and arrested for distribution of hydrocodone and for possession of clonazepam (for which he held a valid prescription).

19. The possession charges were *nolle prossed* on March 1, 2010 after Cazubon agreed to plead guilty to the distribution charge.

20. Plaintiff received a sentence of ten years, but the sentence was suspended by Judge Peter J. Garcia and Cazaubon was placed on probation for five years.

21.     Cazaubon pled guilty because one of the occupants of the home, Ms. Stafford, provided a sworn statement to the police stating that Cazaubon had provided the hydrocodone to the occupants of the home.

22.     Since that time, Ms. Stafford has advised that she provided such statement under duress because the police were threatening her with arrest and with taking her children from her—going so far to suggest that child protection was on the way to pick up her children if she refused to sign a statement against Cazaubon.

23.     Since the plea, Cazaubon has made numerous unsuccessful attempts to challenge his guilty plea.

### The Gold Market

24.     Throughout his life, Cazaubon has maintained and cultivated an interest in jewelry, particularly gold jewelry.

25.     Beginning in 2009, the market price for used gold was at the beginning of an historic increase.

26.     Recognizing a potential business opportunity that would utilize both his existing car dealership location and his knowledge of gold and jewelry, Cazaubon established a gold-buying business at St. Tammany Wholesale in Slidell, Louisiana.

27.     In the Summer of 2010, Cazaubon opened a new business checking account for the company, purchased advertising and signage (*i.e.*, "We buy Gold" flagging, etc.), and obtained necessary occupational permits from the local government.

28. Shortly after he began operating, Cazaubon was visited by Yanice "Bubba" Moseley, who advised Cazaubon that he was in the gold business with the District Attorney, Walter Reed.

29. Moseley and Reed had partnered to start a business that could take advantage of the gold market and they ultimately formed MR Precious Metals, as discussed *infra*.

30. Moseley, who flashed a badge at the time of his visit, strongly suggested that Cazaubon consider selling his gold to Moseley and Reed.

31. Cazaubon refused the offer with the knowledge that bringing an unnecessary middleman into the business would only serve to reduce his profit.

32. Several days later, Moseley visited Cazaubon again and made clear that the offer was not optional.

33. Ultimately, in exchange for Moseley providing Cazaubon and his business $10,000 in cash to purchase gold, it was agreed that Moseley and Reed would be entitled to 30 percent of the profits earned by Cazaubon.

34. This agreement was written and signed by both Cazaubon and Moseley.

35. Additionally, Moseley told Cazaubon that Reed directed Moseley to put the District Attorney's name out there and, if there were any problems, he would take care of them.

36. Thereafter, at the urging of Moseley, Cazaubon introduced Moseley to other gold buyers in the area.

37.     During these introductions, Cazaubon witnessed Moseley make similar claims with those individuals, suggesting it was in their interest to do business with Moseley and Reed and that by doing so, they could benefit in the event that they had legal troubles.

38.     Over the course of the month or so that Cazaubon did business with Moseley, he witnessed Moseley buy gold from several other businesses.

### Moseley and Reed

39.     Reed and Moseley formally established MR Precious Metals on September 8, 2010, but the business had been operating prior to that time.

40.     MR Precious Metals was in the business of purchasing gold from pawn shops, jewelers, and other gold dealers who purchased gold directly from the public.

41.     MR Precious Metals would purchase such gold and sell it to a refiner where it would be melted and reused.

42.     MR Precious Metals did, and does, business with over a hundred different gold buyers across the South.

43.     At all times that MR Precious Metals has operated, Reed was serving as the District Attorney for the 22nd Judicial District Court of Louisiana.

44.     Reed and Moseley have known each other for many years.

45.     Moseley's family has also been involved in the gold business for many years.

46.     Moseley has, in the past, been accused of wrongdoing that called into question his character and ethics.

47.    For example, in December 2010, a civil suit was filed by Darlene Guercia alleging that Moseley had replaced a diamond in a ring with a diamond of lesser quality that resulted in a reduction of the ring's value of more than $75,000 and that he had misrepresented that a Rolex watch left in his possession was stolen.

48.    Notwithstanding known concerns about Moseley's reputation, Reed provided resources to their business partnership, including a large number of Krugerrands, to finance the new business.

49.    It was agreed between Moseley and Reed that Reed would be paid $10,000 per month for his involvement in the business.

50.    Apart from participating in management and supervisory decisions, Reed did not devote significant time to the operation of MR Precious Metals.

### The Enterprise

51.    MR Precious Metals does business in both Louisiana and Mississippi.

52.    On multiple occasions, Moseley would approach individuals and businesses who were recently opened, or considering opening, to buy gold from the public.

53.    In the course of soliciting such businesses to sell their gold to MR Precious Metals, Moseley advised that his partner was Reed, the sitting district attorney, and that there were benefits that would flow from doing business with MR Precious Metals because of the involvement of Reed.

54.    Reed knew, or should have known, that Moseley was making such representations.

55. Moseley would visit them, just as he did Cazaubon, and make clear that it was in their interests to do business with MR Precious Metals.

56. On at least one occasion, these tactics prevented one business owner from moving forward with opening a planned gold buying business.

57. Such actions constitute violations of 18 U.S.C. 1951, interference with commerce by threats, in that Moseley, Reed and MR Precious Metals, were obtaining property from another, with his consent, induced by wrongful use of actual or threatened fear, or under color of official right.

58. MR Precious Metals hired individuals who assisted in picking up the gold, including Chris Reed, Walter's nephew.

59. Another individual hired by MR Precious Metals was Tim Allen, the son of Sonny Allen, a long-time employee of Walter Reed.

60. On information and belief, Allen was made aware of concerns about the business practices of MR Precious Metals by his son.

61. These concerns included knowledge that MR Precious Metals, LLC was knowingly purchasing stolen gold and that it was not complying with applicable laws related to the identification and reporting of used gold purchases.

62. On information and belief, Allen reported these concerns directly to Reed, his long-time employer.

63. On information and belief, Reed took no action, confirming his knowledge of the illegal and unethical business practices of Moseley and MR Precious Metals, LLC.

64. On information and belief, these actions have taken place continuously since 2010 and constitute a pattern of racketeering activity.

## Consequences

65. Cazaubon did business with MR Precious Metals for approximately one month.

66. In mid-September 2010, a conflict arose between Cazaubon and Moseley regarding the purchase of a diamond ring.

67. The ring was worth more than $10,000 and Moseley advised Cazaubon to pay the seller up to $3,500 for the ring, with the understanding that Cazaubon would be paid a commission on the purchase.

68. Cazaubon paid only $2,500, but Moseley refused to pay any commission because he said Reed wanted the ring as a piece of jewelry.

69. Cazaubon insisted that he be paid a commission on the ring.

70. When Moseley refused to do so, Cazaubon terminated their relationship and returned the funds that had been advanced to buy gold, less the commission, along with the ring.

71. Moseley advised Cazaubon that he was "making a big mistake" by ending the business relationship in such a manner.

72. Within ten days of ending his business relationship with MR Precious Metals, a new probation officer, Steve Everly, was assigned to Cazaubon.

73. His home was thoroughly searched around October 7, 2010, but no contraband was identified.

74. Approximately one week later, the premises at St. Tammany Wholesale was the subject of a police raid.

75. Cazaubon was charged with violating parole because of alleged weapons located on the property (*e.g.*, a knife and stun gun) and he was also charged with violations La. R.S. § 37:1910, which regulates the second-hand gold market in Louisiana.

76. On the same day, Cazaubon's house was searched and the police allegedly found a marijuana cigarette on the property.

77. On information and belief, the marijuana was planted at Cazaubon's home the prior week when the house was searched by his probation officer.

78. On December 1, 2010, Cazaubon was found to be in violation of parole related to his possession of a stun gun at his business. At the time of the hearing, there were no lab results concerning the marijuana cigarettes allegedly recovered from Cazaubon's home, nor any evidence to support Detective Ray Smith's testimony that a confidential informant claimed to have sold stolen gold to Cazaubon.

79. As a result of his incarceration of nearly three years due to the revocation, Cazaubon lost the entirety of his business and the associated property that he had acquired and stored on the premises.

80. On information and belief, the search and allegations resulting in the revocation of Cazaubon's probation were an aim of the Defendants intended to intimidate

and persuade other gold dealers to continue doing business, or otherwise consider doing business with, MR Precious Metals.

## CLAIMS

81.     Plaintiffs adopt by reference and incorporates all previous allegations in all preceding paragraphs as if fully set forth herein.

82.     Defendants MR Precious Metals, LLC, Moseley, and Reed are all "persons" within the meaning of 18 U.S.C. § 1961(c).

83.     In the alternative, defendants Moseley and Reed are "persons" within the meaning of 18 U.S.C. § 1961(3) for purposes of 18 U.S.C. § 1962(c).

84.     The enterprise for purposes of 18 U.S.C § 1961(3) and § 1962(b) and (c) is an association-in-fact of Defendants, in addition to others that, on information and belief, were solicited, directly or indirectly, to act in interests that ultimately benefitted the Defendants.

85.     At the present time, these individuals include Cazaubon's probation officer, Steve Everly, and St. Tammany Detective Ray Smith.

86.     The Defendants engage in interstate commerce and have conducted for years, and continue to conduct, the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§1962(a), (b), and (c).

87.     Defendants engaged in, and continue to engage in the herein described patterns of racketeering activities in such a manner to improperly gain market share and exercise improper control over the used gold market in south Louisiana and south

Mississippi, which was the ultimate purpose of the enterprise, such that the predicate acts identified herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. §1961(5).

88.   For the purposes of 18 U.S.C. §1962(b), Plaintiffs specifically allege that, in addition to the allegations already asserted herein, Defendants acquired or maintained an interest in, or controlled the alleged enterprise.

89.   For the purposes of 18 U.S.C. §1962(c), Plaintiffs specifically alleged that Defendants "knowingly and willfully conducted or participated directly or indirectly in the conduct of the alleged enterprise."

90.   As a result of Defendant's unlawful conduct, Plaintiffs have suffered financial injury, including lost profits, lost business opportunities, etc.

91.   Pursuant to 18 U.S.C. §1964(c), Plaintiffs are entitled to damages in an amount three times the damages sustained, reasonable attorney fees and any other damages sustained in connection with any other violations of law.

## JURY DEMAND

92.   Plaintiffs are entitled to, and demand, a trial by jury.

**WHEREFORE**, Plaintiffs pray that, after due proceedings be had, there be judgment rendered herein in their favor and against Defendants, declaring the Defendants are to be liable and indebted unto Plaintiffs for:

    a.   all damages, including treble damages, as are just and reasonable under the circumstances,

b.      judicial interest from the date of judicial demand; and

c.      the award of costs, expenses and reasonable attorneys' fees in favor of Plaintiffs and against Defendants to the fullest extent authorized by law; and

d.      such other and further relief which the Court deems necessary and proper at law and in equity and that may be just and reasonable under the circumstances of this matter.

Respectfully submitted,

*s/Michael S. Fawer*
Michael S. Fawer, No. 5485, T.A.
SMITH & FAWER, L.L.C.
71130 Riverside Dr.
Covington, Louisiana 70433
Tel: (985) 871-7200
mikefawer@aol.com

and

Al J. Robert, Jr., No. 29401
Law Office of Al J. Robert, Jr., LLC
757 St. Charles Avenue, Suite 301
New Orleans, Louisiana 70130
(504) 309.4852
(877) 765.2529 toll-free voice and fax
ajr@ajrobert.com

**ATTORNEYS FOR PLAINTIFFS**

## VERIFICATION

STATE OF LOUISIANA
PARISH OF ORLEANS

        **BEFORE ME**, the undersigned notary public, personally came and appeared:

### ERIC JOHN CAZAUBON

Mr. Cazaubon, who after being duly sworn, did depose and state that he is a plaintiff identified in foregoing complaint that names Yancie Mosely, III, et al. as defendants and that he has read all of the allegations contained in the complaint and attests that they are true and correct to the best of his knowledge, information and belief.

_____
ERIC J. CAZAUBON

Sworn to and subscribed before me
This 25th day of September 2014.

_____
NOTARY PUBLIC
Al J. Robert, Jr. 29401